## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. _____

JEFFREY SWANSON, Individually and On       <u>CLASS ACTION</u>
Behalf of All Others Similarly Situated,

         Plaintiff,

    v.

MAGNUM D'OR RESOURCES, INC. and
MICHEL BOUX,

                                       <u>**JURY TRIAL DEMANDED**</u>

         Defendants.

_____/

## CLASS ACTION COMPLAINT

Jeffrey Swanson ("Plaintiff") alleges the following based upon the investigation of his counsel, which included, among other things: a review of the Defendants' public documents, media reports, United States Securities and Exchange Commission ("SEC") filings, wire and press releases regarding Magnum D'Or Resources, Inc. ("Magnum" or the "Company"), and information readily available on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of persons who purchased or otherwise acquired the Company's common stock (the "Class") between July 2, 2008 and April 13, 2010, inclusive (the "Class Period"), pursuant to the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Magnum claims that it recycles old car tires into rubber compounds that are used to manufacture new products, including new tires.  According to the Company's website:[1] "[t]he [C]ompany was established to deal with the problem of waste tires in a manner that is environmentally friendly and profitable.  It aims to create a closed loop with rubber compounds enabling it to be used as a raw material repeatedly without compromising the quantity or properties of the compounds.  Magnum's 'Green' technology provides a one-of-a-kind solution to all of the challenges in eliminating stockpiles of scrap tires and rubber scrap."

3.      During the Class Period, Magnum made false statements to the marketplace about its growth and operations, and failed to disclose the existence of an SEC Formal Order of Investigation into the Company, not only to its shareholders, but its own outside auditors as well.

4.      The positive news pushed Magnum's stock price up artificially, allowing Magnum to carry out a kickback scheme using its own stock.  The Company issued shares of stock to Dwight Flatt ("Flatt"), David Della Sciucca, Jr. ("Sciucca") and Shannon Allen ("Allen") under two false SEC Form S-8 registration statements, dated December 28, 2007 and June 29, 2009.  Form S-8 registration is available under limited circumstances, for example to issue stock as compensation for employees or consultants for certain types of work they perform, provided other restrictions are met.  Given that Flatt, Scuicca and Allen were not Magnum employees and did no permissible consulting work for the Company, they were ineligible to receive S-8 stock – as defendant Magnum well knew.

5.      According to a complaint filed by the SEC in an action entitled *SEC v. Magnum D'Or Resources, Inc., et al.*, Case No. 11-CV-60920 (S.D. Fla. filed Apr. 29, 2011) (hereinafter cited as "SEC Complaint", and incorporated by reference herein) Flatt, Sciucca and Allen

---

[1] http://magnumresources.net (last visited Oct. 6, 2011).

promptly sold their Magnum S-8 shares in foreign brokerage accounts, kept some of the illicit stock proceeds, and wired the remainder -- more than $7 million -- back to the Company under the guise of loan agreements.

6.      On April 13, 2010, the Company's former outside auditor, Weinberg & Company, P.A. ("Weinberg & Co.") wrote to Joseph J. Glusic ("Glusic"), Magnum's President and Chief Executive Officer, advising him and Magnum that Weinberg & Co. was: (a) withdrawing its audit opinions for Magnum for the fiscal years ended 2009 and 2008, which were included in the Form 10-K filed with the SEC on January 13, 2010 and February 12, 2009; (b) confirming that it had already withdrawn its consents on April 8, 2010 relating to Forms S-1 dated April 6, 2010, March 18, 201, and February 5, 2010; and (c) withdrawing its prior consent relative to the Form S-8 dated June 29, 2009.

7.      Weinberg & Co.'s April 13, 2010 letter was included in a Company Form 8-K filing dated April 16, 2010. Magnum's stock dropped on the news. Magnum, Glusic, and the three "consultants," Flatt, Sciucca and Allen, were later charged by the SEC in the SEC Complaint, discussed in greater detail herein. Glusic resigned as President and Chief Executive Officer on March 19, 2011.

8.      During the Company's fiscal year (October 1, 2008 to September 30, 2009), Glusic had received a salary of $793,000 and a bonus of $2,800,000. (Magnum 2009 Form 10-K, filed 1/13/10) (hereinafter the "2009 Form 10-K"). Glusic agreed to pay the SEC $50,000 as a penalty and to disgorge $1,878. He also agreed to take permanent officer and director penny stock bars. (SEC Litigation Release No. 21951, April 19, 2011). Allen agreed to disgorge $80,742, pay a $25,000 civil penalty, take a 5-year penny stock bar, and surrender 1.4 million shares of Magnum common stock for cancellation. (*Id.*). The SEC will hold administrative

proceedings on whether to revoke registration of each class of Magnum's securities for a period of up to 12 months based on Magnum's failure to file required periodic reports. (*Id.*).

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

11.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the preparation and dissemination of false and misleading information, occurred in this District. In addition, Magnum's principal place of business during whole of the Class Period was in this District, at 1326 S.E. 17th Street, Suite 513, Fort Lauderdale, Florida, 33316.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff purchased Magnum common stock at artificially inflated prices during the Class Period as indicated in the attached Certification, and has been damaged thereby.

14.     Defendant Magnum is a Nevada corporation and currently has its principal place of business located at 2850 West Horizon Ridge Parkway, Suite 200, Henderson, Nevada, 89052. Throughout the whole of the Class Period, Magnum maintained its principal executive offices at

1326 S.E. 17th Street, Suite 513, Fort Lauderdale, Florida, 33316.  After the close of the Class Period, Magnum moved its headquarters first to 12311 Weld County Road 41, Boulder, Colorado, 80642 and then to its current headquarters in Henderson, Nevada.

15.    According to Magnum's Form 8-K filed with the SEC on October 15, 2008, Defendant Michel Boux ("Boux") was "appointed as a director of the Company on October 7, 2008, to fill a vacancy on the Board of Directors, and was also appointed as the Vice President - Canada Operations of the Company."  Additionally, according the to Form S-1 filed by the Magnum with the SEC on February 5, 2010, Boux served as a Company director until December 29, 2009 and he did not qualify as an independent director while he served on the Board of Directors (the "Board").  As of September 30, 2009, Boux beneficially owned approximately 1,042,500 shares of Magnum common stock or approximately 1.43% of the Company's outstanding common stock.[2]

16.    Non-party Joseph J. Glusic served the Company as a director from January 2007 until his resignation on March 18, 2011.  Effective January 1, 2008, until his resignation Mr. Glusic also served as President, Chief Executive Officer, Principal Executive Officer, Chief Financial Officer, Principal Financial Officer, Secretary and Treasurer.  On April 29, 2011, the Securities and Exchange Commission commenced an action alleging fraud against Mr. Glusic and others.  From October 1, 2008, through September 30, 2009, Mr. Glusic received a salary of $793,000 and a Bonus of $2,800,000 for a total compensation of approximately $3.6 million.  In the three years combined that he was director, President, Chief Executive Officer, etc. of Magnum, the Company generated revenues of only $85,070.  On December 17, 2010 Glusic filed for bankruptcy. *In re Joseph John Glusic*, No. 10-bk-33465-BAM (D. Nev.).  An Order

---

[2] Magnum Form 10-K at 39 (filed Jan. 13, 2010).

Discharging Debtor was entered on March 28, 2011, in that bankruptcy proceeding. Plaintiff does not name Glusic in this Complaint but reserves all rights to add Glusic as a defendant and/or obtain leave of court to do so.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

17. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Magnum common stock between July 2, 2008 and April 13, 2010, inclusive, seeking to pursue remedies under the Exchange Act.

18. The members of the Class are so numerous that joinder of all members is impracticable. There were 73,436,212 shares of common stock outstanding as of February 16, 2010. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Magnum or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

20. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and financial results of Magnum; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### A.  Background of the Fraud

23.     On December 28, 2007, Magnum filed a Form S-8 registration statement with the SEC, signed by Chad Curtis, then Magnum's President and Chief Executive Officer, and now a Company consultant and owner of 83% of the Company's voting power.  The Form S-8 falsely represented that Magnum would issue shares as compensation to consultants to the Company, and included a Consultant Stock Option, SAR (stock appreciation rights) and Stock Bonus Plan

stating that "no person shall be a Participant in this Plan in consideration for consulting or other services related to capital raising activities for the Company or related to any stock promotion activities for the Company. (Form S-8, Exhibit 10 thereto, filed 12/28/07).

24.     SEC Form S-8 is used to register company stock that will be offered and sold to employees or consultants under certain circumstances.  To lawfully receive S-8 stock from a company, employees or consultants cannot perform work in connection with a capital-raising transaction or which indirectly promotes or maintains a market for the stock.  Form S-8 cannot be used to register offers and sales of securities to consultants where, by prearrangement or otherwise, the issuer or a promoter controls or directs the resale of the securities in the public market, or the issuer or its affiliates directly or indirectly receive part of the proceeds from such resales.  In addition, services such as investor relations and shareholder communications are considered promotional and consultants doing such work for a company are prohibited from receiving S-8 stock.

25.     Issuing S-8 stock under the prohibited circumstances described above is not an effective registration of the S-8 shares under Section 5 of the Securities Act of 1933 (15 U.S.C. § 77e), which makes it unlawful to sell or deliver unregistered securities.

26.     On June 29, 2009, Magnum filed another Form S-8 registration statement with the SEC, signed by Glusic.  The Form S-8 falsely represented that Magnum would issue shares as compensation to consultants of the Company. Magnum attached an exhibit to the registration statement entitled "2009 Consultant Stock Option, SAR and Stock Bonus Plan" falsely representing that "no person shall be a Participant in this Plan in consideration for consulting or other services related to capital raising activities for the Company or related to any stock promotion activities for the Company." (Form S-8, Exhibit 10 thereto, filed 6/29/09).

27.     In or around July 2008, as alleged by the SEC, Magnum illegally issued shares of S-8 stock pursuant to the Form S-8 registration statements. (SEC Complaint, ¶18).  Magnum issued S-8 stock to Flatt, Sciucca, and Allen that did not contain the required restrictive legend because, according to the SEC, Glusic wrongfully advised Magnum's transfer agent that Magnum properly issued the shares pursuant to the Form S-8 registration statements. Nevertheless, Flatt, Scuicca, and Allen rendered few, if any, permissible services, and were not eligible to receive S-8 stock.  According to the SEC, their only service to the Company "was to funnel profits they had received from selling Magnum S-8 stock back to the company." (SEC Complaint, ¶ 18).

28.     The SEC charged that Magnum entered into several agreements with Flatt, Sciucca and Allen from January 2008 to October 2009 to make it appear they were rendering consulting services for the Company.  The agreements were boilerplate, however, and according to the SEC, stated in part that Flatt, Sciucca and Allen would "act as a consultant to the Company on such matters as the Company may reasonably request." (SEC Complaint, ¶ 19).

29.     According to the SEC, the brokerage account records of Flatt, Sciucca, and Allen show that after receiving the Magnum S-8 stock, these three individuals: 1) deposited most of their shares at Gibraltar Global Securities ("Gibraltar"), a Bahamian broker-dealer; 2) sold their S-8 shares within a few days of depositing them; and 3) wired the S-8 stock sale proceeds directly from their Gibraltar brokerage accounts to Magnum's bank accounts, or indirectly through their personal bank accounts. (SEC Complaint, ¶ 20).

30.     Flatt, Scuicca, and Allen also used their Gibraltar accounts to freely transfer their S-8 shares to one another.  According to the SEC, on June 23, 2009, Flatt transferred two million

S-8 shares to Sciucca, who then liquidated the shares, and wired more than $1.7 million to Flatt, who then transferred the funds to Magnum. (SEC Complaint, ¶ 21).

31.     To disguise these fraudulent transactions, according to the SEC, Magnum entered into sham promissory notes with Flatt, Sciucca, and Allen and other Magnum S-8 recipients around the same time Magnum received the S-8 stock sale proceeds. (SEC Complaint, ¶ 23). As alleged by the SEC, the promissory notes were a sham because many of the note amounts do not match up with the amount of S-8 stock sale proceeds Magnum received, and all of the funds Flatt, Sciucca, and Allen gave Magnum in exchange for the notes were derived from S-8 stock sales. (SEC Complaint, ¶ 23).

32.     The Form S-8 registration statements were materially false and misleading, according to the SEC, because they stated Magnum would issue the S-8 stock for permissible consulting services. (SEC Complaint, ¶ 24).  Magnum and Glusic, according to the SEC, knew they were participating in a fraudulent S-8 kickback scheme, because they tried to conceal the transactions and knew the S-8 stock had not been issued for permissible services. (SEC Complaint, ¶ 24).

**B.  False Statements and Omissions During the Class Period**

33.     The Class Period starts on July 2, 2008 when Magnum touted in a press release that it had signed and closed a five year, $40 million contract, with National Sales & Supply LLC ("NSS") for rubber nuggets. *See Magnum D'Or* Resources *Increases its 5-Year Agreement with National Sales & Supply for Rubber Nuggets to $40,000,000,* July 2, 2008.  This came shortly after the Company had announced a prior deal with NSS for a five year, $90 million contract.  As a result of these announcements, the Company described itself in numerous press releases as follows: "Magnum currently holds open and unfilled contracts with NSS, LLC

equating to over $130 Million USD over the next five years for the production of both rubber nuggets and rubber buffings." *Magnum Completes $1 Million Schedule D Conventional Funding Subscription and When Fully Executed Will Produce $2 Million in Proceeds to the Company*, September 29, 2008; *Magnum Secures $15 Million Expansion Funding Through SIMCO GROUP*, March 18, 2009.

34.     This statement was false and misleading because according to the SEC, the contracts were "no minimum" contracts that did not require the purchase of any specific amount of Magnum's products. (SEC Complaint, ¶ 26). As of its year end September 30, 2009, Magnum's revenues were only $85,070. (2009 Form 10-K).

35.     On July 2, 2008, Magnum's trading volume rose to 56,550 shares and its stock price closed at $0.36.  Magnum's trading volume the previous day was 1,400 shares with a closing price of $0.25.

36.     Subsequently, on September 30, 2008, the Company issued a press release announcing it had completed a $1,000,000 non-dilutive type debt financing and was closing out its previously filed $1MM (Schedule D) subscription offer, dated April 30, 2008.  The Company further touted that it "holds open and unfilled contracts with NSS, LLC equating to over $130 Million USD over the next five years for the production of both rubber nuggets and rubber buffings."

37.     On March 18, 2009, Magnum issued a press release claiming to have secured $15 million in financing.  Glusic was quoted as stating: "The $15,000,000 funding will be used to immediately expand [one of Magnum's facilities] and increase capacity."

38.     This statement was false.  On January 6, 2010, Magnum announced the financing "is still proceeding forward although it has been delayed several times.  Magnum will update the

market on the current status of this funding avenue in the near future." Magnum has never received this funding. (*See* SEC Complaint, ¶ 28). In its Answer to the SEC Complaint, Magnum admitted the falsity of the March 18, 2009 statement quoted above. (*See SEC v. Magnum D'Or Resources, Inc., et al.*, No. 11-cv-60920, D.E. #9, at ¶ 28) (hereinafter "Magnum Answer").

39.     Beginning in April 2009, Magnum began touting its plan to acquire a tire landfill. In press releases in April 2009, Magnum made it appear the acquisition was imminent. *See Magnum Enters Negotiations to Acquire U.S. Tire Landfill Operator*, April 13, 2009; *Magnum Updates Acquisition of U.S. Tire Landfill Operator and Prepares for New Rubber Recycling Equipment to Arrive at Magnum Magog Facility*, April 20, 2009; *Magnum Signs Letter-of-Intent to Acquire U.S. Landfill Operator*, April 24, 2009 (stating that the Company has "come to final terms and signed a Letter-of-intent to acquire an enormous tire landfill in the United States").

40.     These statements were materially false and misleading. Magnum did not disclose that the tire company it sought to acquire was going through Chapter 11 bankruptcy until Magnum revealed it in its Form 10-Q for the period ended June 30, 2009, filed with the SEC on August 19, 2009. According to Magnum, the Company had to engage as a creditor in the bankruptcy proceeding hearing in response to its offer to purchase certain assets from the estate of Tire Recycling, Inc. Although the Federal Bankruptcy Court ultimately approved the sale, Magnum failed to make timely disclosure of the bankruptcy litigation for many months. Magnum has admitted the falsity of the April 2009 press releases cited above. (Magnum Answer, ¶ 29).

41.     On April 29, 2009, Magnum's trading volume rose to more than 2 million shares. Average trading volume for Magnum shares from January through March 2009 was

approximately 31,424 shares. Magnum's stock price closed at $1.54 on April 28, 2009. The average closing price of Magnum stock from January through March 2009 was $0.43.

42.     On June 21, 2009, Magnum announced in a press release that Glusic had filmed "an exclusive interview" with Roger Ballentine, former senior member of the Clinton White House staff. *See Magnum Films Exclusive Interview with Roger Ballentine, Ex-Chairman of the White House Climate Change Task Force to be Aired on CNBC, Fox Business News, and Hong Kong's Asia Television*, June 21, 2009. In the press release, Glusic was quoted as saying: "We are extremely honored to be chosen by Mr. Ballentine and the 21st Century Business Television to showcase our company and its revolutionary technology." Magnum also misleadingly implied that Ballentine endorsed Magnum.

43.     The foregoing statement was false and misleading. Ballentine did not choose Magnum. Magnum had merely retained the services of Multi-Media Productions (USA), Inc., the producer for 21st Century Business Television. Multi-Media Productions (USA), Inc. hired Ballentine to appear on its shows. Moreover, Ballentine had not endorsed Magnum; Ballentine was a paid infomercial spokesman and discussed environmental and recycling issues generally as related to six different purported "green" companies including Magnum. Magnum has admitted that it retained 21st Century Business Television and Roger Ballentine to produce an infomercial. (Magnum Answer, ¶ 31).

44.     On June 22, 2009, Magnum's trading volume rose to more than 1.3 million shares. Magnum's stock price closed at $0.99 per share, compared to the prior day's close of $0.82. Magnum's average volume from May through June 19, 2009 was 202,846 shares per day.

45.     On June 29, 2009, Magnum filed a Form S-8 registration statement signed by Glusic. The Form S-8 falsely represented that Magnum would issue 10 million shares of

common stock as compensation to consultants of the Company. In an exhibit entitled "2009 Consultant Stock Option, SAR and Stock Bonus Plan" Magnum stated that "no person shall be a Participant in this Plan in consideration for consulting or other services related to capital raising activities for the Company or related to any stock promotion activities for the Company." (June 29, 2009 Form S-8, Exhibit 10 thereto, at ¶1.1).

46.    The foregoing statements were false and misleading for the reasons set forth above in ¶¶ 23 to 32 above.

47.    Magnum's false press releases and statements identified above, coincided with the Company's issuance of more than 12 million S-8 shares, a fact Magnum admits. (Magnum Answer, ¶ 33). The Company's false Class Period statements enabled Magnum's S-8 recipients, including Flatt, Sciucca and Allen, to liquidate a significant number of their shares into the market.

48.    On January 13, 2010, Magnum filed its 2009 Form 10-K for the fiscal year ended September 30, 2009, signed and certified under the Sarbanes-Oxley Act by Glusic. The 2009 Form 10-K was materially false and misleading because it failed to disclose the SEC's issuance of its Formal Order of Investigation, dated October 30, 2009.

49.    Magnum should have disclosed the SEC's Formal Order of Investigation, as Magnum's own former independent outside auditor, Weinberg & Co., told Glusic and Magnum: "[A]dditional disclosures related to the SEC's issuance of its Formal Order of Investigation, dated October 30, 2009, should have been included within [Weinberg & Co.'s] audit report dated January 5, 2010 and within the footnotes to the Company's 2009 financial statement as a material event and contingency. Such Order was not provided to [Weinberg & Co.] until April 7, 2010." (Form 8-K, dated April 13, 2010). Magnum's failure to timely disclose the SEC's

formal investigation was false and misleading and led Weinberg & Co. to withdraw its audit report, dated January 5, 2010, which was included in Magnum's 2009 Form 10-K. Weinberg & Co.'s audit report had stated, among other things, that Magnum's financial statements included in the 2009 Form 10-K were "in conformity with accounting principles generally accepted in the United States of America." (2009 Form 10-K at 17).

50.     On February 16, 2010, Magnum filed its Form 10-Q for the quarterly period ended December 31, 2009, signed and certified under the Sarbanes-Oxley Act by Glusic. The December 31, 2009 Form 10-Q was materially false and misleading because it failed to disclose the SEC's Formal Order of Investigation, dated October 30, 2009.

51.     Magnum's failure to disclose the SEC's Formal Order of Investigation, dated October 30, 2009 was false and misleading. Magnum's former outside independent certified public accountant, Mantyla McReynolds LLC advised Magnum that "the unaudited financial statements of the Company for the three month period ended December 31, 2009, cannot be relied upon because (among other things) additional disclosures related to the SEC's issuance of a Formal Order of Investigation dated October 30, 2009 should have been included within the Company's financial statements and within the footnotes as a material event and contingency. A copy of such order was not previously provided to Mantyla McReynolds LLC."

52.     On April 1, 2011, shortly before the end of the Class Period, the Company issued a press release over *PR Newswire* entitled "Magnum USA Adds Two New Tire Disposal Clients and Updates Market. In this press release, the Company touted the addition of two new tire collection and disposal clients, significant infrastructure improvements, and its pleasure "to see new clients consistently joining the Magnum family." At no point in this release did the Company disclose its wrongful conduct discussed in greater detail above.

## THE TRUTH IS REVEALED

53.     On April 13, 2010, the Company's outside auditor, Weinberg & Co., advised Glusic and Magnum that Weinberg & Co. was: (a) withdrawing its audit opinions for Magnum for the fiscal years ended 2009 and 2008, which were included in the Form 10-K filed with the SEC on January 13, 2010 and February 12, 2009; (b) confirming that it had already withdrawn its consents on April 8, 2010 relating to Forms S-1 dated April 6, 2010, March 18, 2010, and February 5, 2010; and (c) withdrawing its prior consent relative to the Form S-8 dated June 29, 2009. (Form 8-K, dated April 13, 2010).

54.     Magnum's stock priced dropped on this news, from a closing price of $0.45 on April 13, 2010 to a closing price of $0.31 on April 14, 15 and 16 on heavy trading volumes: 1,383,136 shares on 4/14/10; 1,431,158 shares on 4/15/10; and 718,447 shares on 4/16/10.

55.     On April 19, 2010, the Company's outside auditor Mantyla McReynolds LLC resigned as the independent certified public accountants of the Company from any further audit services to the Company. (Form 8-K filed 4/22/10).

56.     On May 25, 2010, *Market News Publishing* reported that the Company's stock had undergone a symbol/status change; MDOR had been changed to MDORE.  The stated reason for the change was that the Company was delinquent in required SEC filings.  The article explained that "[a]ll Security Symbols appended with an "E" will be ineligible for quotation and subject to removal from the OTCBB in 30 calendar days (60 days if denoted with a plus sign "+") if the NASD does not receive information indicating that the company is current in its public reporting obligations pursuant to Rule 6530."

57.     On April 28, 2011, the SEC issued an Order of Suspension of Trading with respect to the Company.  In it, the SEC noted that "there is a lack of current and accurate

information concerning the securities of Magnum d'Or Resources, Inc. ("Magnum") because of questions regarding the accuracy of assertions by Magnum in its Web site and in press releases to investors concerning, among other things: (1) The company's current financial condition; and (2) the company's current operations."[3]   The SEC therefore suspended trading in the Company's securities for the period of April 29, 2011 through May 12, 2011.

58.     Magnum filed no other quarterly or annual reports with the SEC for the remainder of 2010 after the above-referenced Form 8-K filed on April 22, 2010.  In 2011, Magnum also failed to file any quarterly or annual reports, filing only three Forms 8-K, on April 15, May 9 and May 20, 2011.

59.     On April 29, 2011, the SEC charged Magnum, Glusic, and the three "consultants," Flatt, Sciucca and Allen in the SEC Complaint, as discussed above.

60.     On or about September 2, 2011, Weinberg & Co. filed a complaint against the Company in the Southern District of Florida, in an action entitled *Weinberg & Company, P.A. v. Magnum, D'Or Resources, Inc.*, Case 9:11-cv-80994-KLR (hereinafter, the "Weinberg Complaint").  In the Weinberg Complaint, the Company's former outside auditor sued for breach of contract, account stated, open account, and, in the alterative, for fraud in the inducement.  In addition to claiming that, *inter alia*, the Company has failed to pay Weinberg & Co. for services rendered, the Weinberg Complaint also alleges that, in seeking Weinberg & Co.'s Consent to be associated with, and to have its two prior 2008 and 2009 Audit Reports included and/or referenced in a Form S-1/A Registration Statement that Magnum caused to be filed with the SEC, the Company falsely represented that it had disclosed all documents it filed with the SEC and all correspondence between it and the SEC.  (Weinberg Complaint, ¶¶ 30-36).

---

[3] http://edocket.access.gpo.gov/2011/2011-10850.htm (last visited Oct. 6, 2011).

## UNDISCLOSED ADVERSE FACTS

61.     The market for Magnum's common stock was open, well-developed and efficient at all relevant times.  Throughout the Class Period, Magnum common stock traded on the Over the Counter Bulletin Board under the symbol "MDOR.OB."  As a result of these materially false and misleading statements and failures to disclose, Magnum's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Magnum's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Magnum, and have been damaged thereby.

62.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Magnum common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

63.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.

64.     As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Magnum and its financial well-being, business relationships, and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant

times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

65.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

66.     During the Class Period, Plaintiff and the Class purchased common stock of Magnum at artificially inflated prices and were damaged thereby.   The price of Magnum common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

67.     Defendants acted with scienter because they: (i) knew, or recklessly disregarded, that the public statements issued or disseminated by them were materially false and misleading; (ii) knew that such statements would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Magnum and its business practices and the Company's true financial state and business prospects, their control over, and/or receipt and/or modification of Magnum's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Magnum, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

68.     At all relevant times, the market for Magnum's securities was an efficient market for the following reasons, among others:

(a)     Magnum's stock was traded on the Over the Counter Bulletin Board with trading volume of in the hundreds of thousands and millions of shares throughout the Class Period;

(b)     Magnum regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)     Magnum was followed by securities analysts during the Class Period which were publicly available and entered the public marketplace.

69.     As a result of the foregoing, the market for Magnum's common stock promptly digested current information regarding the Company from all publicly-available sources and reflected such information in Magnum's stock price. Under these circumstances, all purchasers of Magnum's common stock during the Class Period suffered similar injury through their purchase of common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

70.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Magnum who knew that those statements were false when made.

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

71.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

72.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Magnum common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

73.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Magnum common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

74.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Magnum's financial results, business relationships, and prospects, as specified herein.

75.    Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Magnum's value and performance, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Magnum and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Magnum's common stock during the Class Period.

76.    Defendants' primary liability, and controlling person liability, arises from the following facts: (i) Boux was a high-level executive and director at the Company during the Class Period, a member of the Company's management team, or had control thereof; (ii) Boux, by virtue of his responsibility and activities as a senior officer and/or director of the Company was privy to adverse material information about the business, operations and future prospects of Magnum as specified herein; (iii) Defendants were aware of the dissemination of information to

the investing public which they knew or recklessly disregarded was materially false and misleading.

77.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of supporting the artificially inflated price of Magnum's common stock.  As demonstrated by Defendants' material misstatements about the Company's operating condition, business practices and future business prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

78.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Magnum common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Magnum's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material, adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Magnum common stock during the Class Period at artificially high prices and were damaged thereby.

79.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the

other members of the Class and the marketplace known the truth regarding the Company's inadequate internal controls and financial results, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Magnum common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

80.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

81.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act
### (Against Boux)

82.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

83.    Boux acted as a controlling person of Magnum within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level position, and awareness of the Company's operations and/or intimate knowledge of the false statements in connection with the Company's Class Period business, operations and future prospects of Magnum that were disseminated to the investing public, Boux had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Boux was provided with or had unlimited access to data about the Company's business, operations and future prospects of Magnum, issued the statements that Plaintiff alleges

are materially false and misleading, and/or shortly after these statements were issued and had the ability to cause the statements to be corrected.

84.    In particular, Boux had direct and supervisory involvement in the day-to-day operations of the Company, as well as its financial reporting processes and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

85.    As set forth above, Boux violated Section 10(b) and Rule 10b-5 by his acts and omissions as alleged in this Complaint.  By virtue of his position as a controlling person, Boux is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Boux's wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding damages in favor of Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 12, 2011

**BARKER, RODEMS & COOK, P.A.**

By: _____

Chris A. Barker (FL Bar No. 885568)
cbarker@barkerrodemsandcook.com
501 East Kennedy Boulevard, Suite 790
Tampa, FL 33602
Tel.: (813) 489-1001
Fax: (813) 489-1008

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
sdr@rigrodskylong.com
Timothy J. MacFall
tjm@rigrodskylong.com
Scott J. Farrell
sjf@rigrodskylong.com
585 Stewart Avenue, Suite 304
Garden City, NY 11530
Tel.: (516) 683-3516
Fax: (302) 654-7530

*Counsel for Plaintiff*